[No. B149374. Second Dist., Div. One. June 26, 2003.]

SIMI CORPORATION, Plaintiff and Respondent, v.
JOHN GARAMENDI, as Insurance Commissioner, etc., Defendant and
Appellant;
WORKERS' COMPENSATION INSURANCE RATING BUREAU, Real
Party in Interest and Appellant.

## COUNSEL

Bill Lockyer, Attorney General, Richard W. Bakke, Dean Freeman, Mark P. Richelson and Marla K. Markman, Deputy Attorneys General, for Defendant and Appellant.

LeBoeuf, Lamb, Greene & MacRae, Thomas E. McDonald and Sanford Kingsley for Real Party in Interest and Appellant.

Law Offices of Barry L. Kramer and Barry L. Kramer for Plaintiff and Respondent.

## OPINION

**SPENCER, P. J.—**

### INTRODUCTION

The Insurance Commissioner of the State of California and the Workers' Compensation Insurance Rating Bureau (WCIRB) appeal from a judgment granting a petition for writ of mandate. The judgment requires the Insurance Commissioner to set aside and vacate his decision interpreting certain regulations governing the reporting status of workers' compensation claims, as applied to three specific claims made against Simi Corporation.

Appellants contend the trial court erred in failing to dismiss the case as moot, in setting aside the Insurance Commissioner's interpretation of his own regulations and in admitting into evidence documents not presented to the Insurance Commissioner in the underlying administrative proceeding. We agree with the second of appellant's contentions, that the Insurance Commissioner's interpretation of the regulations at issue was entitled to deference and must be upheld. We therefore reverse the judgment.

### STATUTORY AND REGULATORY FRAMEWORK

Workers' compensation laws are to be "liberally construed by the courts with the purpose of extending their benefits for the protection of persons injured in the course of their employment." (Lab. Code, § 3202.) Toward that end, Labor Code section 5402, subdivision (b), provides that "[i]f liability is not rejected [by the employer] within 90 days after the date the claim form is filed under Section 5401, the injury shall be presumed compensable under this division." The presumption thus created can be rebutted only by evidence discovered after the 90-day period. (Cal. Code Regs., tit. 8, § 9812, subd. (j).) Neither Simi Corporation, the employer, nor its insurer rejected liability for the claims at issue within 90 days of the claims' filing. The presumption consequently applies in this case.

All workers' compensation insurers must report workers' compensation claim data to a central repository, a rating organization that the Insurance Commissioner has designated. (Ins. Code, §§ 11734, subd. (b), 11751.5.) The WCIRB serves as the rating organization to which all workers' compensation insurers must report data.

To achieve a uniform system for accurately recording and analyzing data, Insurance Code section 11751.5 authorizes the Insurance Commissioner to

adopt "reasonable rules and statistical plans" for reporting loss and expense information. To achieve this end, the Insurance Commissioner adopted the California Workers' Compensation Unit Statistical Plan (Unit Statistical Plan). (Cal. Code Regs., tit. 10, § 2318.5.)

The Unit Statistical Plan applicable to these proceedings was adopted January 1, 1983, amended January 1988 and reprinted in 1993. It requires each insurer to report detailed information about incurred losses in connection with claims made against its insured. (Unit Statistical Plan, § II(G)(12) & (13).)[1] The data reported provide the raw material with which to develop an "experience modification factor" for each qualified employer. That factor plays a part in calculating the employer's workers' compensation insurance premium.

An experience rating plan, "in which the California workers' compensation insurance experience of the particular insured is . . . a factor in" determining whether to raise or lower the premium (former Ins. Code, § 11730), determines the experience modification factor. Since January 1, 1995, the rating plan must "contain reasonable eligibility standards, provide adequate incentives for loss prevention, and . . . provide for sufficient premium differentials so as to encourage safety." (Ins. Code, § 11736.)

The experience rating plan in effect when Simi Corporation's employees made the three claims at issue here sets out the rules governing experience rating. Some of these rules describe how WCIRB calculates an employer's experience modification factor based on data the employer reports to WCIRB. (Cal. Code Regs., tit. 10, § 2353.)

Section III, part B, paragraph 1(b) of the 1983 Unit Statistical Plan sets out three ways that a claim initially reported as compensable may be declared noncompensable. "A correction or revision of losses must be filed if . . . [o]ne or more claims are declared noncompensable. A claim is declared non-compensable if: [¶] (1) There is an official ruling specifically holding that a claimant is not entitled to benefits under the Workers' Compensation Laws of California, even though the claimant may have been awarded reimbursement for expenses incurred by the claimant in presenting his case. [¶] (2) No claim was filed during the period of limitation provided by the Workers' Compensation Laws of California for the filing of such claim, and the carrier therefore closes the claim. [¶] (3) Where the carrier contends, prior to the valuation date, that a claimant is not entitled to benefits under the Workers' Compensation Laws and the claim is officially

---

[1]The Unit Statistical Plan was superseded by the Uniform Statistical Reporting Plan, adopted January 1, 1995.

closed because of the claimant's failure to prosecute his claim."[2] It is the Insurance Commissioner's interpretation of the third contingency that is at issue in the instant case.[3]

## FACTUAL AND PROCEDURAL BACKGROUND

Simi Corporation purchased workers' compensation insurance from Superior Pacific Casualty Company, then known as Pacific Rim Assurance Company, for two years commencing December 31, 1989. The three employee claims at issue in this proceeding developed during the coverage period. The insurer paid out sums for medical-legal expenses, i.e., expenses incurred in connection with a medical evaluation of the claimant to determine compensability, for each of these claimants. (Lab. Code, § 4060.) The sums paid vary from $3,685.14 for claim No. 02-39165 to $4,443 for claim No. 02-57512 and $5,208.75 for claim No. 02-37713.

The insurer denied each of these claims in 1992, which the claimants did not pursue further through the insurer. The insurer thereupon closed its internal claim files. It closed one file sometime after April 12, 1993 and closed the other two files in 1994.

Simi Corporation sued Superior Pacific Casualty Company at some point before 1998, alleging that the insurer's erroneous report of data regarding the three claims referenced above had damaged Simi Corporation. While that civil suit was pending, Simi Corporation requested that WCIRB determine whether the insurer had reported losses properly for these three claims. Simi Corporation argued that the insurer should have filed revised loss reports for the three claims, in that they satisfied the "declared non-compensable" definition set forth in the 1983 Unit Statistical Plan at section III, part B, paragraph 1(b). The insurer filed opposition, arguing that it had reported the claims in conformity with the Unit Statistical Plan.

The WCIRB subsequently issued a letter decision in which it concluded that the insurer had reported the loss information correctly with respect to the three claims in question. Simi Corporation then appealed that decision to the Insurance Commissioner pursuant to Insurance Code section 11753.1, subdivision (a). The appeal was assigned to an administrative law judge who held a hearing at which each party presented argument based on a stipulated

---

[2]The term "officially closed" first appeared in the Unit Statistical Plan adopted in March 1955. It appears in the Uniform Statistical Reporting Plan, which superseded the Unit Statistical Plan on January 1, 1995, at part 4, section V, rule 2(a)(2).

[3]The successor experience rating plan adopted at California Code of Regulations, title 10, section 2353.1, effective January 1, 1995, contains nearly identical language, as do provisions of Insurance Code section 11751.8, which became effective on the same date.

record and requests for official notice. The Insurance Commissioner thereafter issued his decision affirming WCIRB's conclusion that the insurer had reported the information about the three claims correctly.

While the administrative proceeding was pending, Simi Corporation and Superior Pacific Casualty Company settled the civil action. Simi Corporation agreed to release its claims for monetary damages and specific performance while retaining the ability "to prosecute or otherwise continue to pursue the Department of Insurance appeal bearing file No. ALB-WCA-99-1."

## CONTENTIONS

Appellants contend the superior court erred in failing to dismiss the petition for writ of administrative mandamus as moot. We disagree.

Appellants assert the superior court erred in failing to accord due deference to the Insurance Commissioner's interpretation of his own regulations and in vacating that interpretation. We agree.

Finally, appellants contend the superior court erred prejudicially in admitting into evidence documents not presented to the Insurance Commissioner in the underlying administrative proceeding and in failing to remand the case to the commissioner for reconsideration in light of the new evidence. In view of the conclusion expressed above, we need not reach the merits of this contention.

## DISCUSSION

*Mootness*

Appellants argue that Simi Corporation's writ petition was moot when the superior court entered its judgment, in that Simi Corporation had settled its claims against Superior Pacific Casualty Company for misreporting claims data and dismissed its suit against the company. Appellants are mistaken.

A case becomes moot when a court ruling can have no practical impact or cannot provide the parties with effective relief. (*Downtown Palo Alto Com. for Fair Assessment v. City Council* (1986) 180 Cal.App.3d 384, 391 [225 Cal.Rptr. 559].) That is not the case here.

The settlement agreement between Simi Corporation and Superior Pacific Casualty Company expressly provides that it "does not affect Simi's right to

prosecute or otherwise to continue to pursue the Department of Insurance appeal bearing file no. ALB-WCA-99-1, which concerns Simi's assertion that three workers' compensation claims handled by Superior Pacific should have been reported to the Bureau as non-compensable. *In the event that Simi's position with respect to said appeal is upheld, Superior Pacific agrees to file corrected loss reports in accordance with the administrative decision.*" (Italics added.)

In other words, should Simi Corporation prevail, Superior Pacific Casualty Company will file corrected loss reports declaring the three claims at issue to be noncompensable rather than compensable. That will result in lower experience modification factors for years after those in which Superior Pacific Casualty Company insured Simi Corporation. Under the Experience Rating Plan, losses fall within the "experience periods" for the following three years. (Experience Rating Plan, § III(2).) Simi Corporation therefore might expect premium refunds from its subsequent insurers. A favorable decision in this case consequently *can* have a practical impact and *can* afford Simi Corporation with effective relief, notwithstanding its settlement agreement with Superior Pacific Casualty Company. In short, the case is not moot. *(Downtown Palo Alto Com. for Fair Assessment v. City Council, supra,* 180 Cal.App.3d at p. 391.)

*Validity of Insurance Commissioner's Interpretation*

■ There are two broad categories of factors relevant to a court's assessment of an administrative agency's interpretation of a regulation. The categories are (1) factors " 'indicating that the agency has a comparative advantage over the courts [in interpreting the regulations at issue],' " and (2) factors " 'indicating that the interpretation in question is probably correct.' " *(Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 12 [78 Cal.Rptr.2d 1, 960 P.2d 1031].)

"In the first category are factors that 'assume the agency has expertise and technical knowledge, especially where the legal text to be interpreted is technical, obscure, complex, open-ended, or entwined with issues of fact, policy, and discretion. A court is more likely to defer to an agency's interpretation of its own regulation than to its interpretation of a statute, since the agency is likely to be intimately familiar with regulations it authored and sensitive to the practical implications of one interpretation over another." *(Yamaha Corp. of America v. State Bd. of Equalization, supra,* 19 Cal.4th at p. 12.) With respect to the second category, a court may look to the form of the interpretation and whether it was prepared by senior agency officials or by staff members. It also may consider whether the agency has

adhered consistently to the interpretation at issue and whether there was an opportunity for comment to be made on that interpretation. (*Id.* at pp. 12-13.)

■ As the Supreme Court has noted recently, "interpretation of [an insurer's] reporting requirements as contained in the 1983 unit statistical plan is best suited to the administrative process." (*State Comp. Ins. Fund v. Superior Court* (2001) 24 Cal.4th 930, 943 [103 Cal.Rptr.2d 662, 16 P.3d 85].) The data reporting regulations applicable to this matter are esoteric and highly technical in nature. They are complex and extensive. The Unit Statistical Plan contains voluminous instructions and specifications. The Insurance Commissioner administers the plan as an expert on the technical issues arising under data reporting rules. (Cf. *State Comp. Ins. Fund v. McConnell* (1956) 46 Cal.2d 330, 340-341 [294 P.2d 440].) As the appellate court notes in *State Compensation Ins. Fund v. Brown* (1995) 32 Cal.App.4th 188 [38 Cal.Rptr.2d 98], "[t]here [consequently] is good reason for deferring to an initial agency determination: the propriety of premium rates and surcharges involve factors and methodology which require quasi-legislative action involving expertise in the subject matter . . . ." (*Id.* at p. 199.)

At issue here is the proper interpretation of regulations governing the data reporting and experience rating systems, matters as to which the Insurance Commissioner possesses substantial experience and technical expertise. All of the factors noted above thus favor giving judicial deference to the Insurance Commissioner's interpretation of the regulations. We review the commissioner's interpretation de novo, of course, but we do so " 'giving deference to the determination of the agency appropriate to the circumstances of the agency action.' " (*Yamaha Corp. of America v. State Bd. of Equalization, supra,* 19 Cal.4th at p. 8, italics omitted.)

It might appear superficially that no deference is due the commissioner's interpretation in this instance, in that the interpretation turns solely on the plain language of the regulation. That is incorrect. The particular expertise the Insurance Commissioner brings to his interpretation on this occasion is his deep understanding of the *context* in which the regulation exists.

■ We construe statutes and regulations in a manner that carries out the legislative or regulatory intent. (*Trope v. Katz* (1995) 11 Cal.4th 274, 280 [45 Cal.Rptr.2d 241, 902 P.2d 259].) We must " 'ascertain the intent of the [drafters] so as to effectuate the purpose' " of the regulations. (*Moyer v. Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224].) The words used are the primary source for identifying the drafter's intent. (*Ibid.*) We give those words their usual and ordinary meaning where possible. (Code Civ. Proc., § 1858; *Trope, supra,* 11 Cal.4th

at p. 280.) We give significance to every word, avoiding an interpretation that renders any word surplusage. (*Delaney v. Superior Court* (1990) 50 Cal.3d 785, 798-799 [268 Cal.Rptr. 753, 789 P.2d 934].) We also interpret the words of a regulation in context, harmonizing to the extent possible all provisions relating to the same subject matter. (*County of Alameda v. Pacific Gas & Electric Co.* (1997) 51 Cal.App.4th 1691, 1698 [60 Cal.Rptr.2d 187].)

■■■ As indicated *ante*, "A correction or revision of losses must be filed if . . . [o]ne or more claims are declared non-compensable. A claim is declared non-compensable if: [¶] (1) There is an *official ruling* specifically holding that a claimant is not entitled to benefits under the Workers' Compensation Laws of California, even though the claimant may have been awarded reimbursement for expenses incurred by the claimant in presenting his case. [¶] (2) No claim was filed during the period of limitation provided by the Workers' Compensation Laws of California for the filing of such claim, and the carrier therefore closes the claim. [¶] (3) Where the carrier contends, prior to the valuation date, that a claimant is not entitled to benefits under the Workers' Compensation Laws and the claim is *officially closed* because of the claimant's failure to prosecute his claim." (Unit Statistical Plan, § III, pt. B, par. 1(b), italics added.)

The first contingency clearly requires an *official ruling* that a claimant is not entitled to workers' compensation benefits. That is, it requires a determination by the Workers' Compensation Appeals Board that the claimant's case has no merit, whereupon the board will close the case, barring any further claim unless the claimant successfully challenges the board's ruling in court.

The second contingency requires the operation of law, i.e., the passage of a statutorily prescribed period of time, the limitations period, without the employee filing a claim with the employer (Lab. Code, § 5400) or an application for the adjudication of a claim with the Workers' Compensation Appeals Board (*id.*, § 5404). One may question how the insurer could have an open claim if the employee never filed a claim. The answer is one the Insurance Commissioner understands well. A conscientious employer not uncommonly will alert the insurer that a workplace injury has occurred, thus prompting the insurer to open a claims file. In some of these cases, the injured worker, although notified by the employer of his or her possible entitlement to benefits (*id.*, § 5402), will fail to pursue the matter by filing a claim with the employer (*id.*, § 5401, subd. (b)) within the limitations period for filing an application for adjudication of the claim with the Workers' Compensation Appeals Board (*id.*, §§ 5401, subd. (c), 5405). Once that period has passed, the insurer may close the claim file, secure in the

knowledge that any objective observer will understand that the claim has no further legal viability, as is the case under the first contingency when the Workers' Compensation Appeals Board closes a case that has no merit.[4]

The first and second contingencies thus share a common feature. When they have been fulfilled, any objective observer understands that, barring an extraordinary and unlikely event, the claim has no further legal viability. The ordinary rules of document construction suggest strongly that the third contingency therefore must possess the same feature. This is how the Insurance Commissioner interpreted the third contingency, as requiring official action from the Workers' Compensation Appeals Board or a court to close the case due to failure to prosecute it, thus introducing objective certainty that, on the whole, the claim no longer has legal viability.[5] It is a sound interpretation, firmly grounded upon the law governing the interpretation of regulations and paying deference to the goals underlying the unit statistical plan and the experience rating plan.

In contrast, interpreting the third contingency as allowing an insurer to "officially close" a claim unilaterally once the claimant has failed to pursue it within a reasonable period of time introduces uncertainty into the rating system. It would allow a claim to be "declared non-compensable" without any "official" action by those charged with administering workers' compensation laws, i.e., the Worker's Compensation Appeals Board and, when a claimant challenge's the board's action, the courts. That this is the meaning of "officially closed" is clear from the meaning given "official ruling" in the first contingency. ■ A word or phrase "given a particular scope or meaning in one part or portion of a law . . . shall be given the same scope and meaning in other parts or portions of the law." (*Stillwell v. State Bar* (1946) 29 Cal.2d 119, 123 [173 P.2d 313].)

---

[4]Claims falling under the second contingency retain *theoretical* viability, in that the lapse of the limitations period is an affirmative defense that must be raised or waived if a claimant attempts to pursue a claim after its expiration. (Lab. Code, § 5409.) This theoretical viability is no different than the theoretical viability of a claim denied by the board as lacking in merit. Yes, it is possible the claimant yet could prevail by pursuing the claim after expiration of the limitations period and encountering a negligent insurer who fails to raise the limitations bar, just as it is possible that a claimant possessing a meritless claim might persuade a court that it in fact has merit. Neither event is likely, however.

[5]Before January 1, 1994, there was a theoretical possibility that an application for adjudication dismissed for lack of prosecution could be revived by the applicant. If the lack of prosecution was solely the applicant's failure to appear before the Board, the dismissal would have been "without prejudice." (Cal. Code Regs., tit. 8, § 10562.) While such an applicant *could have* revived his or her claim, it is as unlikely that an applicant who had abandoned the claim upon learning of the insurer's rejection would revive it after dismissal as it is that a claimant who had run afoul of the limitations period would encounter a negligent insurer who would fail to raise the statute of limitations as an affirmative defense.

 Moreover, common sense dictates that "officially closing" a claim file requires action by the Workers' Compensation Appeals Board or the courts. An insurer's closure of its internal claim file has no legal effect on the employee's ability to pursue a claim before the board. Before January 1, 1990 and since January 1, 1994, if an insurer denied the claim before expiration of the limitations period, it remained potentially viable until the expiration of that period. An employee could respond to an insurer's notice of denial by filing an application for adjudication of the claim within the limitations period and then sit on his or her rights.

From January 1, 1990, through December 31, 1993, the period during which employees filed the three claims at issue, filing the claim with the employer brought it within the jurisdiction of the Workers' Compensation Appeals Board. (Former Lab. Code, § 5401, subd. (c) [amended by Stats. 1990, ch. 1550, § 54.7, pp. 7294-7295; amendment repealed and replaced by Stats. 1993, ch. 1242, § 39, pp. 7182-7183]; *Moran v. Bradford Building, Inc.* (1992) 57 Cal.Comp.Cases 273, 277.) As long as the board had not made findings and an award or other disposition of the case, the employee claimant therefore could come before the board and pursue his or her claim notwithstanding the insurer's denial of the claim and closure of its internal claims file. (*Unigard Ins. Co. v. WCAB* (1994) 59 Cal.Comp.Cases 966, 967.)

In either case, whether a pre-1990 or post-1993 claimant files a timely application for adjudication of the claim and then sits on his or her rights or a 1990-1993 claimant simply remains silent, the insurer's prior denial of a claim and closure of the claim file is a nonevent in terms of the potential for legal viability of the claim. Stated otherwise, such closure of the claim file cannot be viewed logically as an "official" act, for the employee's claim remains legally viable, notwithstanding the claimant's failure to respond to the insurer's notice that it is denying the claim. Of course, if a pre-1990 or post-1993 claimant failed to file a timely application for adjudication of the claim, its legal viability would lapse upon expiration of the limitations period, bringing it within the second contingency.

In the present case, however, the claimants were not required to do anything to maintain the legal viability of the claims until such time as some official action recognized that they had been abandoned. In other words, contrary to Simi Corporation's interpretation of events, the presumption of compensability (Lab. Code, § 5402, subd. (b)) remained active in these cases until such time as official action rebutted it.

Rather than reading the phrase "officially closed" as used in the third contingency compatibly with the phrase "official ruling" as used in the first

contingency, Simi Corporation's interpretation reads the former phrase in a manner compatible with the phrase "the carrier closes the claim," used in the second contingency. In doing so, Simi Corporation renders surplusage the word "officially" in the third contingency. It also replaces the phrase "declared non-compensable," meaning made noncompensable by express official act or implicit operation of law, with the phrase "deemed non-compensable," meaning made noncompensable by means of the insurer's unilateral action. Simi Corporation's interpretation runs contrary to the ordinary rules of interpretation for these reasons as well.

Simi Corporation also erroneously asserts that only an insurer can close a claim. The Workers' Compensation Appeals Board has had procedures allowing it to dismiss a claim adjudication case for lack of prosecution for several decades. (*Moran v. Bradford Building, Inc., supra,* 57 Cal.Comp.Cases at p. 280.) Doing so closes a claim whether or not the insurer closes its internal claim file. Clearly, then, claim closure is not solely the act of an insurer.

The existence of decades-old procedures for dismissing claims for lack of prosecution also destroys Simi Corporation's argument that the Insurance Commissioner's interpretation of the third contingency requires performance of an impossibility. Before 1990 and since 1994, the Workers' Compensation Appeals Board acquired jurisdiction over a claim when the employee claimant filed with the board an application for adjudication of the claim. (Lab. Code, § 5401, subd. (c); Historical and Statutory Notes, 45 West's Ann. Lab. Code (2003 supp.) foll. § 5401, p. 15 [1993 legislation].) Accordingly, if the insurer denied the claim and heard no further from the employee claimant or from the board, the operation of law on the passage of time would close the claim officially. The "officially closed" language in the third contingency of the regulation governing revising a claim from "compensable" to "declared non-compensable" dates from 1955. For decades, then, interpretation of the phrase "officially closed" as requiring official action, either expressly or by operation of law, did not require performance of an impossibility.

From January 1, 1990, when the Legislature amended former Labor Code section 5401, subdivision (c), to give the Workers' Compensation Appeals Board jurisdiction over a claim when the employee filed it with the employer, until January 1, 1994, the effective date of Labor Code section 5404.5, as amended by Statutes 1993, chapter 1242, section 40, pages 7183-7184, the board temporarily had no effective means of "officially closing" an abandoned claim. While the board had inherent power to dismiss a claim for various reasons, including abandonment (*Moran v. Bradford*

*Building, Inc., supra,* 57 Cal.Comp.Cases at pp. 280-282), having made its existing rules applicable to claims filed before January 1, 1991 (*id.* at p. 278), it had no rules in place that would allow it to do so (*id.* at pp. 282-283).

This unfortunate oversight did not change the meaning of language first adopted in 1947, however, when there *were* procedures to "officially close" an abandoned claim. (*Moran v. Bradford Building, Inc., supra,* 57 Cal.Comp.Cases at p. 280.) It merely created a temporary frustration, which the Legislature soon moved to eliminate. The enactment of Labor Code section 5404.5 remedied the flaw. For claims filed between January 1, 1990, and January 1, 1994, either the insurer or the employer could put in motion the machinery that would lead to dismissal for failure to prosecute by serving or securing service of the appropriate notice. (Cal. Code Regs., tit. 8, § 10120.)

While subdivisions (a) and (b) of Labor Code section 5404.5 refer to the claims adjuster serving the requisite notice, Simi Corporation at least could have initiated the process and made it worthwhile for the insurer to complete it promptly. Simi Corporation could have prepared the notice in the form required by law, transmitted it, proof of service to be completed by the insurer, an addressed and postage prepaid envelope for mailing and a return envelope as required by Code of Civil Procedure section 415.30, and demanded that the insurer serve it forthwith or face legal action to compel service. If the employer has not paid the employee any benefits, dismissal then occurs by operation of law unless the claimant files an application for adjudication within 180 days of the insurer's compliance by service of the notice. (Lab. Code § 5404.5, subd. (a).)

Instead of suing its insurer for failing to report the three claims at issue here, all of which were filed in the 1990-1993 period, as "declared noncompensable," Simi Corporation could have availed itself of this remedy, through the process described above, as soon as it became available and secured either dismissal or prosecution of the claims. If the claims were dismissed, the insurer would have been duty-bound to report them as "declared non-compensable," which could have resulted in partial premium refunds to Simi Corporation.

Simi Corporation argues that the Insurance Commissioner's interpretation of the regulation at issue somehow makes a claim "compensable" for reporting purposes when the insurer's actions have signaled that the claim clearly is noncompensable. The argument is fallacious. The insurer initially reports the claim as compensable due to its *potential* viability. Ratings determinations look to possible future disbursements as well as to those

already made. Not all disputed or denied claims result in no compensation being paid. Some will be settled to achieve certainty. A settled claim may be closed administratively when and as the insurer pleases, but it is a *compensable* claim. An unsettled claim remains potentially viable until the Workers' Compensation Appeals Board declares it noncompensable, either expressly or by closing it officially, or until it lapses by operation of law. The commissioner's interpretation thus does not *make* the claim compensable. Rather, the claim *remains* compensable until an official act determines otherwise.

As the Insurance Commissioner realized, if an insurer's unilateral act can "officially close" a claim, allowing such a practice introduces uncertainty into the rating system, for there would be no requirement that insurers follow uniform standards in deciding to close a claim. An insurer may close a claim *administratively* when and as it sees fit, but giving official imprimatur to that act could mean wide variations in the circumstances under which a claim is declared noncompensable. As we have discussed at length, Simi Corporation's interpretation of the pertinent regulation consistently ignores the continuing legal viability of many claims that have been closed administratively. Certainly, when administrative closure follows expiration of the limitations period, it has "official" effect under the second contingency. It has that effect, however, only because the claim has lapsed definitively by operation of law.

Simi Corporation is also incorrect in arguing that an insurer has incentives to close claim files without seeking dismissal from the Workers' Compensation Appeals Board or by operation of law. All claim costs will be reflected in future insurance premium rates. (Ins. Code, § 11732.) The question is whether those costs should be attributed to a particular employer, in the case of compensable claims, or to all employers insured through the workers' compensation system, in the case of noncompensable claims for which insurers nonetheless have incurred costs. The insurer has no stake in that determination. It will receive the rates necessary either from all employers or from a particular employer—*if* the particular employer continues to purchase insurance from the insurer, something the insurer cannot know. It is therefore incorrect to argue that the insurer has a vested interest in maintaining a claim as compensable by closing its claim file administratively rather than seeking official closure that would declare the claim to be noncompensable.

In summary, the trial court erred in adopting Simi Corporation's interpretation of the pertinent regulation rather than the Insurance Commissioner's interpretation. The latter interpretation is logical, sound and consistent with

the purposes of the experience rating system. Inasmuch as it is neither erroneous nor unauthorized, it must stand. (*Yamaha Corp. of America v. State Bd. of Equalization, supra,* 19 Cal.4th at p. 12; *Culligan Water Conditioning v. State Bd. of Equalization* (1976) 17 Cal.3d 86, 93 [130 Cal.Rptr. 321, 550 P.2d 593].)

*Validity of Evidentiary Ruling*

Appellants contend the superior court erred prejudicially in admitting into evidence documents not presented to the Insurance Commissioner in the underlying administrative proceeding and in failing to remand the case to the commissioner for reconsideration in light of the new evidence. In view of the conclusion expressed above, we need not reach the merits of this contention.

The judgment is reversed. Appellants are to recover costs on appeal.

Vogel (Miriam A.), J., and Mallano, J., concurred.

Respondent's petition for review by the Supreme Court was denied October 15, 2003. Baxter, J., did not participate therein.