[No. B226134. Second Dist., Div. One. Feb. 16, 2012.]

ALLIED INTERSTATE INCORPORATED, Plaintiff and Respondent, v. SESSIONS PAYROLL MANAGEMENT, INC., Defendant and Appellant.

810

**COUNSEL**

Law Offices of Paul A. Beck, Paul A. Beck; and Mark Kester Brown for Defendant and Appellant.

Sakamaki & Baumgartner and Francis T. Sakamaki for Plaintiff and Respondent.

**OPINION**

**CHANEY, J.**—Defendant Sessions Payroll Management, Inc. (Sessions), appeals from a judgment entered after a court trial in which it was found to have breached a contract for workers' compensation insurance by failing to pay the premium. Defendant contends the trial court erred in finding that it, rather than its successor, was obliged to pay the premium and in finding that the premium was properly increased by application of a 121 percent experience modifier. We affirm.

## BACKGROUND

The facts are taken from the reporter's and clerk's transcripts and trial exhibits lodged on appeal. There is no material dispute over the facts, only over their legal effect.

Sessions is a payroll company that contracts with motion picture production companies to provide administrative services. It issues payroll checks to movie extras, calculates and deducts appropriate withholding taxes, remits taxes to the appropriate agencies, obtains workers' compensation insurance

coverage, processes workers' compensation claims, and makes quarterly unemployment reports to California's Employment Development Department (EDD).

Sessions's employees fall under two classification codes for purposes of workers' compensation insurance underwriting: clerical personnel and motion picture personnel. Sessions is only a nominal employer of the motion picture personnel, as it does not meet with or hire or fire the movie extras, supervise them, visit their worksites, control their hours, wages, or working conditions, or maintain a continuing relationship with them postproduction.

Sessions was owned by its founder, Jim Knight, from its inception in 1979 to January 1, 2005, when Knight sold the corporation to John Heffernan, one if its officers. Heffernan subsequently formed Entertainment Production Services, Inc. (EPSI), and transferred Sessions to it. The payroll operations continued under the "doing business as" designation Sessions Payroll Management until 2008, at which time Heffernan returned Sessions to Knight's ownership.

The State Compensation Insurance Fund (SCIF), a public enterprise fund that provides workers' compensation insurance to employers (Ins. Code, §§ 11770, 11773),[1] issued policies to Sessions from 2002 to 2004. On January 5, 2005, Sessions, through its broker, applied to SCIF for renewal of its workers' compensation policy. The application stated that Sessions was 100 percent owned by Knight (though by this time Knight had sold the business to Heffernan) and employed 12 clerical personnel full time and 550 movie production personnel part time. The estimated payroll for the clerical staff was $500,000 and for the movie production personnel $7 million. The application showed that Sessions had been insured by SCIF in 2002, 2003 and 2004 and by Kemper Insurance in 2000 and 2001.

On March 8, 2005, SCIF issued workers' compensation policy No. 1672784-05 to Sessions for the period January 1, 2005, through January 1, 2006 (the policy). The policy identified "Sessions Payroll Management, Inc.," as the insured, stated it covered Sessions's liability to its employees, not "the liability of any [other] employer," and obligated Sessions to inform SCIF immediately when the information contained in the declarations regarding Sessions's operations was no longer accurate.

The policy provided that the "estimated" premium would be calculated by multiplying pertinent base rates by the reported payroll of "all [Sessions's]

---

[1] Undesignated statutory references will be to the Insurance Code.

employees eligible for benefits under [the] policy."[2] This premium would then be enhanced or reduced by application of "any duly authorized experience modification."[3]

Part five of the policy provided that the premium thus calculated was only an estimate; the final premium would be calculated after a postterm audit was conducted to verify Sessions's payroll for the policy term. The final premium, like the estimated premium, would be reduced or enhanced by any "rates and rating plans that lawfully apply to the business and work covered by th[e] policy." The policy provided that Sessions would accept any increased final premium calculated under a rating plan approved by the Insurance Commissioner and would pay all premiums when due.[4]

To determine the experience rating applicable to the policy, SCIF forwarded Sessions's payroll and operations information to the Workers' Compensation Insurance Rating Bureau (the Rating Bureau). After considering Sessions's estimated payroll, type of work, and workers' compensation claims experience for 2001, 2002 and 2003, in June 2005 the Rating Bureau directed that an experience modifier of 121 percent be applied to the policy premium. Accordingly, on June 28, 2005, SCIF issued an endorsement agreement that provided, "It is agreed that the policy contract premium earned at the base rates shall be modified by 121 [percent] in accordance with the Workers' Compensation Experience Rating Plan."

In a disclosure statement, Sessions was informed that it could request that the Rating Bureau reconsider any "decision, action, or omission to act" or review the manner in which its rating system was applied. If Sessions was dissatisfied with the results of any such request, it could appeal to the Insurance Commissioner within 30 days of receiving notice of SCIF's or the Rating Bureau's decision or 120 days after the request was made if no notice was given.

Sessions made monthly premium payments for most of 2005, calculating the premium due each month by multiplying the interim base rate for each of its two employee classifications—clerical and movie production—by that classification's payroll for the month. Beginning with the July payroll period, Sessions increased its payments by 21 percent in accordance with the experience rating issued by the Rating Bureau (i.e., Sessions multiplied the premium by the bureau's 121 percent experience rating).

---

[2] The base rates were 1.94 for clerical personnel and 6.34 for movie personnel, applied as a percentage.

[3] The premium was also subject to a "rating-plan modifier" of 1.07 and a 15 percent discount.

[4] If the policy was canceled before the end of the policy term, the final premium would be "calculated pro rata based on the time th[e] policy was in force."

In November 2005, Sessions notified SCIF it had been sold to Heffernan (which had actually occurred 11 months earlier) and requested that the policy be canceled and a new policy issued. SCIF thereafter canceled the policy effective November 7, 2005, and issued a new policy.

On May 2, 2006, Jeri Garcia, SCIF's auditor, conducted an audit of Sessions's operations for the 2005 policy term. Garcia met with Heffernan and Guido Dito, Sessions's risk manager, examined the company's payroll, employment, and insurance records, and reported her findings to SCIF. SCIF used Sessions's payroll information and the 121 percent experience modifier provided by the Rating Bureau to calculate the final policy premium: $874,595.44.

On June 5, 2006, Knight contacted SCIF to dispute, among other things, application of the 121 percent experience modifier. He argued the movie production companies, not Sessions, were the movie extras' actual employers. Because each movie company was established specifically to make each new motion picture, Knight argued, each company should be afforded a "New Employer" rate, i.e., should be given an experience rating of 100 percent. SCIF disagreed, maintaining it did not have new employer rates for temporary staffing agencies that provided employees to new-in-business clients.

On April 23, 2008, Sessions's attorney complained to the Rating Bureau, contending the 121 percent experience rating derived from Sessions's workers' compensation experience should not apply to the 2005 policy because the business was operated by EPSI, not Sessions. The Rating Bureau disagreed, finding that the transfer of Sessions from Knight to Heffernan and the subsequent formation of EPSI did not result in a material change in operations or employees. Accordingly, the Rating Bureau could not disregard Sessions's experience rating in favor either of EPSI's rating or that of its movie production clients. The Rating Bureau also noted that Sessions's request for a revision of its experience rating was untimely. It refused to review the matter further and notified Sessions that if it disagreed with the decision it had 60 days to serve the Rating Bureau with a written complaint and request for action. Sessions took no further action.

Sessions refused to pay $184,093.30 of the final premium.

SCIF demanded payment and, when Sessions refused, assigned its claims to plaintiff Allied Interstate Incorporated (Allied), which filed a complaint for breach of contract and the common counts of account stated and open book account.

At trial, Sessions argued it did not owe the disputed premium amount for two reasons: (1) Sessions had been sold to EPSI effective January 1, 2005,

making EPSI liable for the premium, and (2) SCIF overbilled for the policy by applying an improper experience rating.

Daniel Koppenheffer, an underwriter for SCIF, testified that the Rating Bureau derives an experience rating for a particular insured by considering the industry in which the covered employees work, the insured's operations, and the history of workers' compensation claims, including open and closed claims. To calculate the experience rating of an employee leasing agency, where employees are often sent to a single location on a long-term basis, the Rating Bureau assesses the work record of the *client's* operations. To calculate the experience rating of a temporary agency, whose employees may be sent to many different locations on short-term assignments, the Rating Bureau uses the *insured's* claims experience to evaluate the risk.

Sessions functioned like both a temporary agency and an employee leasing agency because its nominal employees—the movie extras—worked at offsite locations for several different clients. At the same time, it was unlike either type of agency because it could not hire or fire the movie employees or control where they worked. When underwriting the policy here, Koppenheffer himself had concluded that Sessions's operations were more akin to those of a temporary agency than a leasing agency because the movie extras worked at many different locations for short periods of time. Using criteria established by the Rating Bureau, he assessed the policy risk based on Sessions's claims experience, not the experience of the movie production companies.

Koppenheffer explained that Sessions had an estimated payroll of $7 million for movie personnel and $500,000 for clerical personnel. It had presented 16 workers' compensation claims in 2002, 11 in 2003, and 20 in 2004, all involving movie personnel, none involving clerical personnel. Sessions was given experience modifiers of 202 and 165 percent in 2000 and 2001, respectively, when it was insured by Kemper Insurance, and 100, 114 and 109 percent in 2002, 2003 and 2004, respectively, when it was insured by SCIF. Based on this history, Koppenheffer concluded Sessions's experience rating was appropriately derived from its own operations, not from the operations of its clients.

Sessions disagreed, repeating its argument that SCIF should have applied a "carryover" rating to the movie personnel, i.e., one derived from the operations and claims history of the movie production companies, the movie extras' actual employers. Because each movie production company was newly formed for each new motion picture, it would have no claims history, and thus its experience rating would be 100 percent. Sessions also continued to argue that because operations had been taken over by EPSI early in the policy period, EPSI, not Sessions, owed the unpaid premium.

Rejecting Sessions's arguments, the trial court in a tentative oral ruling found (1) Sessions had secured insurance from SCIF under the terms stated in the policy; (2) the 121 percent experience modifier was lawful and duly applied both to clerical and movie personnel; and (3) Sessions, not EPSI, was obligated to pay the premium. The court entered judgment against Sessions and in favor of Allied on May 26, 2010, in the amount of $184,093.30 plus interest.

Sessions filed a timely appeal.

## DISCUSSION

Sessions contends the 121 percent rating was not "duly authorized," as required by the policy, because a 100 percent experience rating carried over from its clients' claims experience applied. It also contends EPSI was liable for premiums incurred after SCIF learned Knight had sold Sessions to Heffernan. The appeal presents questions of law and contract interpretation, both of which are subject to de novo review. (*Topanga and Victory Partners v. Toghia* (2002) 103 Cal.App.4th 775, 779–780 [127 Cal.Rptr.2d 104]; *Winet v. Price* (1992) 4 Cal.App.4th 1159, 1166 [6 Cal.Rptr.2d 554].)

### A.   *The 121 Percent Experience Modifier Was Duly Authorized*

Pursuant to the policy, Sessions agreed to pay a premium that would be based on Sessions's payroll and "any duly authorized experience modification."

#### 1.   *SCIF and the Rating Bureau*

■ Article XIV, section 4 of the state Constitution authorizes the Legislature to create SCIF as part of the grant of power "to create . . . and enforce a complete system of workers' compensation." SCIF, created in 1913 and periodically "continued in existence" by statute, is governed by sections 11770 to 11881. (§ 11770; see *State Comp. Ins. Fund v. McConnell* (1956) 46 Cal.2d 330, 337 [294 P.2d 440].) It is both a state agency and an insurance carrier, intended to be "fairly competitive with other insurers" and "neither more nor less than self-supporting." (§ 11775; see § 11778; *Burum v. State Compensation Ins. Fund* (1947) 30 Cal.2d 575, 586 [184 P.2d 505]; *Gilmore v. State Comp. Ins. Fund* (1937) 23 Cal.App.2d 325, 329 [73 P.2d 640].) Profits earned may not be retained by SCIF or the state, but must be returned to SCIF's insureds as a dividend or credit. (*Gordon's Cabinet Shop v. State Comp. Ins. Fund* (1999) 74 Cal.App.4th 33, 35 [87 Cal.Rptr.2d 541] ["Under the statutory scheme, SCIF . . . is not intended to accumulate and hold assets over and above the amounts needed for liabilities, necessary reserves, and a reasonable surplus."].) SCIF's assets are applicable only "to the payment of

losses sustained on account of insurance and to the payment of the salaries and other expenses charged against it." (§ 11774.)

■ Workers' compensation insurance is governed by statute and the rates are supervised by the Insurance Commissioner. Pursuant to section 11732, insurers are required to establish rates that are adequate to cover the insurer's losses and expenses. (§ 11732; see § 11775.) Section 11820 requires SCIF's board of directors to give "due regard to the physical hazards of each industry, occupation, or employment" when establishing rates. "Within each class of business insured such rates shall be fixed, so far as practicable, in accordance with the following elements: [¶] (a) Bodily risk or safety, or other hazard of the plant, premises or work of each insured employer. [¶] (b) The manner in which the work is conducted. [¶] (c) A reasonable regard for the accident experience and history of each such insured. [¶] (d) A reasonable regard for the insured's means and methods of caring for injured persons." (§ 11821.)

■ To facilitate determination of the accident experience and history of each insured, the workers' compensation system allows "experience rating," a "procedure utilizing past insurance experience of the individual policyholder to forecast future losses by measuring the policyholder's loss experience against the loss experience of policyholders in the same classification to produce a prospective premium credit, debit, or unity modification." (§ 11730, subd. (c).)

Experience rating is performed by rating organizations that have as their "primary object or purpose the collecting of loss and expense statistics and other statistical information and data [and] the making of pure premium rates and those rating plans authorized by Section 11734 for workers' compensation insurance . . . ." (§ 11750.1, subd. (b).) A rating organization must be licensed by the Insurance Commissioner (§§ 11751–11751.2) and, subject to the approval of the commissioner, "may make reasonable rules for the regulation of its members and the conduct of its business" (§ 11751.3, subd. (a)). Each workers' compensation insurer must belong to a rating organization. (§ 11750, subd. (a).) The Rating Bureau is the commissioner's designated rating organization and statistical agent. (*Simi Corp. v. Garamendi* (2003) 109 Cal.App.4th 1496, 1500 [1 Cal.Rptr.3d 207].) SCIF is a member of the Rating Bureau.

### 2. *Experience Ratings in General*

■ Each workers' compensation insurer must report claims data to a rating organization designated by the Insurance Commissioner. (§§ 11734, subd. (b), 11751.5.) "To achieve a uniform system for accurately recording and

analyzing data, Insurance Code section 11751.5 authorizes the Insurance Commissioner to adopt 'reasonable rules and statistical plans' for reporting loss and expense information." (*Simi Corp. v. Garamendi, supra,* 109 Cal.App.4th at pp. 1500–1501.) To achieve this end, the Rating Bureau publishes the California Workers' Compensation Uniform Statistical Reporting Plan—1995 (Statistical Reporting Plan; available at <https://wcirbonline.org/wcirb/root/pdf/usrp_ic_regs_only.pdf> [as of Feb. 16, 2012]) and the California Workers' Compensation Experience Rating Plan—1995 (Experience Rating Plan; available at <https://www.wcirbonline.org/wcirb/root/pdf/erp_ic_regs_only.pdf> [as of Feb. 16, 2012]). The plans are compendia of administrative rules and regulations governing the issuance of workers' compensation coverage by SCIF and other carriers. They set forth classifications, rates and rating systems approved by the commissioner pursuant to sections 11658 and 11730 et seq. and have been incorporated by reference into the California Code of Regulations. (Cal. Code Regs., tit. 10, §§ 2318.6, 2353.1.)

Every workers' compensation insurer must adhere to the Experience Rating Plan. (§ 11734, subd. (a).)

■ The Statistical Reporting Plan requires an insurer to report detailed information about individual incurred losses in connection with claims made against the insured. (Statistical Reporting Plan, pt. 4, § 5.) The Experience Rating Plan provides that the insured's "entire California workers' compensation insurance experience . . . under any policy that provides California workers' compensation insurance coverage for all or a part of the [insured's] operations . . . shall be reported and used in determining its experience modification." (Experience Rating Plan, § III, rule 3.) "The experience of any such policy shall be used whether the operations covered by such policy are normal to the [insured's] business or otherwise." (*Ibid.*)

The data reported by workers' compensation insurers to the Rating Bureau "provide the raw material with which to develop an 'experience modification factor' for each qualified employer. That factor plays a part in calculating the employer's workers' compensation insurance premium." (*Simi Corp. v. Garamendi, supra,* 109 Cal.App.4th at p. 1501; see *P. W. Stephens, Inc. v. State Compensation Ins. Fund* (1994) 21 Cal.App.4th 1833, 1838 [27 Cal.Rptr.2d 107] ["It is well settled that the experience of a particular insured may be used as a factor in setting the premium."].)

The experience rating derived from the insured's workers' compensation claims "shall be applied to the base premium developed in connection with the coverage provided during the effective period of the experience modification." (Experience Rating Plan, § I, rule 4.)

### 3. *Sessions's Experience Rating*

■ In sum, section 11732 requires that SCIF charge rates that are adequate to cover its losses and expenses. To assist it to do so, the Insurance Commissioner is tasked with developing a uniform experience rating plan. (§ 11734.) To help with the development of such a plan, the commissioner is empowered to designate a rating organization—here the Rating Bureau—to gather, compile, and report relevant statistical information and develop a classification system. (§ 11734, subd. (b).) It is undisputed all entities performed as they were required to do: SCIF interviewed Sessions regarding its operations, payroll, and claims history and forwarded the information to the Rating Bureau; the Rating Bureau used the information to derive an experience modifier tailored to Sessions's operation; and SCIF applied the modifier to the policy. Each step was mandated by the statutes and regulations summarized above. The experience modifier was thus duly authorized.

Sessions argues the 121 percent experience rating was nevertheless incorrect for a number of reasons: (1) Labor Code section 3602 contemplates that a "carryover" experience modifier will be applied to workers' compensation policies issued to nominal employers; (2) a carryover rating is also applied in the context of employee leasing arrangements; (3) other states have applied carryover ratings to nominal employers such as payroll companies; and (4) application of a carryover experience modifier here would promote equity and consistency. The argument is without merit. Under the policy, Sessions agreed to pay any premium that was "duly authorized." The issue at trial was whether the 121 percent experience modifier was duly authorized. As discussed above, it was. Nothing more was required or permitted.

■ If Sessions believed the experience modifier was incorrect or inequitable, its remedy was to petition the Rating Bureau to have the modifier changed. Evaluation of the proper risk factors to apply to a given industry requires a comprehensive understanding of the particular occupations involved, the risks they entail, the needs of the workers' compensation system, and the manner in which experience ratings are generally applied in the workers' compensation context. (See, e.g., *Cumbre, Inc. v. State Comp. Ins. Fund* (2010) 189 Cal.App.4th 1381, 1384–1385 [117 Cal.Rptr.3d 582] [discussing SCIF's historical capital position and its risk-based plan to increase capital by, among other changes, increasing premium rates]; see also *Farmers Ins. Exchange v. Superior Court* (1992) 2 Cal.4th 377, 399 [6 Cal.Rptr.2d 487, 826 P.2d 730] [evaluation of ratemaking regulations "calls for exercise of administrative expertise preliminary to judicial review"].) The Rating Bureau, with its staff and experience with workers' compensation insurance, is in the best position initially to assess the propriety of any experience classification imposed by an insurer, a question singularly within the technical competence

of that agency and, through it, the Insurance Commissioner. (See *P.W. Stephens, Inc. v. State Compensation Ins. Fund, supra,* 21 Cal.App.4th at p. 1842 ["administrative review is appropriate because of the expertise of the Commissioner and his agency resources and because of the complexity of the matter presented"]; *Karlin v. Zalta* (1984) 154 Cal.App.3d 953, 983 [201 Cal.Rptr. 379] [insurance commissioner and agencies enlisted are singularly capable in the first instance of evaluating complex policy issues].)

A trial judge should be called upon to assess the validity or reasonableness of an experience modifier mandated by the Rating Bureau "[o]nly after an administrative record is created in which comparative data is provided, analyzed and rationalized by the experts familiar with the methodologies involved." (*P.W. Stephens, Inc. v. State Compensation Ins. Fund, supra,* 21 Cal.App.4th at p. 1842.) Here, the record would not permit the trial court to make the broad-ranging and technical determination that workers' compensation insurance issued to a payroll company should reflect a carryover experience rating.

B. *The Change in Ownership Did Not Compel Policy Cancellation*

Finally, Sessions contends that once SCIF discovered that operational control of the payroll business had been transferred from Sessions to EPSI, it should have canceled Sessions's policy and issued a new policy to EPSI. We disagree.

■ A change in ownership of an insured does not make a policy change necessary. This is implicitly recognized by the Rating Bureau itself, which does not change an insured's experience rating unless a material change in ownership is accompanied by a material change in operations or employees. (Cal. Code Regs., tit. 10, § 2353.1; Experience Rating Plan, § IV, rule 1.) A change in operations is material only if the operations after the change in ownership differ from those before the change to such an extent that employees are exposed to substantially different hazards. (Experience Rating Plan, § IV, rule 1.b(1).) A change in employees is material only if a majority of employees conducting operations within 90 days before the change in ownership are not conducting those operations within 90 days after the change. (*Id.,* § IV, rule 1.b(2).)

Effective January 1, 2005, Knight sold Sessions to Heffernan, who continued Sessions's operations. Other than the change in ownership, no evidence suggested Sessions discontinued or materially changed its operations. For example, though Knight testified Sessions had contracts with various movie production companies, he did not state those contracts had changed after Sessions was sold to Heffernan and later transferred to EPSI. Therefore, it

appears only that ownership changed, not operations. There was therefore no reason to issue a new policy.

## DISPOSITION

The judgment is affirmed.

Rothschild, Acting P. J., and Johnson, J., concurred.

A petition for a rehearing was denied March 6, 2012, and appellant's petition for review by the Supreme Court was denied May 9, 2012, S201177.