Filed 3/1/24 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| GOPAL BALAKRISHNAN,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>THE REGENTS OF THE<br>UNIVERSITY OF CALIFORNIA,<br><br>    Defendant and Respondent. | A164480<br><br>(Alameda County<br>Super. Ct. No. RG19018682)<br><br>ORDER GRANTING RESPONDENT'S MOTION FOR CONFIDENTIAL TREATMENT OF STUDENT IDENTITIES AND MODIFYING OPINION<br><br>NO CHANGE IN JUDGMENT |

THE COURT:*

Respondent's motion for confidential treatment of student identities, filed on February 7, 2024, is granted.

It is ordered that the opinion filed herein on February 1, 2024, be modified as follows:

1.    On page 3, the paragraph that begins, "The University received multiple complaints about plaintiff's conduct," is deleted and replaced with: "The University received multiple complaints about plaintiff's conduct. One of the more serious complaints, involving Jane Doe, an academic, came in anonymously. Since Jane Doe did not wish to participate in a formal investigation, the Title IX office relied on information she gave to a news Web site to identify an eyewitness who was willing to speak. The

---

\* Jackson, P. J.; Burns, J.; Chou, J.

1

Title IX office also decided to investigate complaints from three other individuals:  John Doe 1, Anneliese H., and John Doe 2.”

2.    On page 3, the paragraph that begins, “Jane Doe, a poet and academic from the East Coast,” is deleted and replaced with:  “Jane Doe, a poet and academic from the East Coast, met plaintiff when she traveled to Berkeley in 2013 to attend the three-day East Bay Poetry Summit (Poetry Summit), which plaintiff also attended.  Jane Doe, along with a friend and professor (Witness 1), were invited to stay overnight at the home of the professor who was hosting the Poetry Summit.  One evening, after the Poetry Summit ended for the day, the professor held a party for attendees at her home.  It was a festive affair.  At some point, Jane Doe and plaintiff were observed kissing.  After midnight, however, Jane Doe and Witness 1 retired for the evening to the study where they were sharing a bed.  A short while later, Jane Doe woke up to find plaintiff in the study, drunkenly trying to get in bed and asking to have sex with her.  She told plaintiff that she was not interested in sexual activity and ‘ “shooed” ’ him from the room.  Nonetheless, about 2:00 a.m., Jane Doe woke up again to find plaintiff naked and ‘loom[ing] over her while she lay in bed.’  Plaintiff climbed into bed, and Jane Doe could feel his penis poking into her side.  Jane Doe and Witness 1 forced plaintiff from the room and, this time, barricaded the door with furniture so he could not return.”

3.    On page 4, the paragraph that begins, “After completing the Doe investigation,” is deleted and replaced with:  “After completing the Jane Doe investigation, the investigator found plaintiff engaged in ‘unwelcome physical conduct of a sexual nature which is conduct that falls squarely within the definition of prohibited conduct under the University of California Policy on Sexual Harassment dated February 10, 2006, the policy in effect at the time of the incident.’  However, the investigator could not substantiate a violation of this policy because it only applied to ‘ “member[s] of the University community.” ’ ”

4.    On pages 7 and 8, both the heading and the text of section C (of part I of the factual and procedural background) are deleted and replaced with:

“**C. John Doe 1 and John Doe 2.**

“Former UCSC student John Doe 1 reported that, during the fall or winter of 2009, when he was 18 years old, he attended a small party at plaintiff’s residence.  John Doe 1 knew plaintiff through campus activities but was not his student.  At this party, plaintiff gave John Doe 1

and other attendees cocaine and alcohol, and afterward he drove John Doe 1 home while under the influence of alcohol and drugs. John Doe 1 also recalled other occasions during this time period when plaintiff bought him alcohol at local bars although he was underage. John Doe 1 contacted the Title IX office after learning of the public accusations that had been raised against plaintiff because he believed his experiences were relevant.

"Following an investigation, the investigator found by a preponderance of the evidence that plaintiff gave John Doe 1 alcohol and cocaine at a party and bought him alcohol at least twice at local bars despite knowing he was under age 21.

"John Doe 2 was a Ph.D. candidate in the History of Human Consciousness Department in 2015, and plaintiff was his adviser. According to John Doe 2, one afternoon he visited plaintiff's office to discuss his dissertation. The pair engaged in a heated discussion regarding the appropriate direction of John Doe 2's dissertation. At some point, plaintiff became verbally and physically aggressive. John Doe 2 protested and tried to leave, but plaintiff blocked him by lunging at him and aggressively grabbing him.

"John Doe 2 reported this incident to Professor Dean Mathiowetz in November 2015 and later discussed it with the department's chair, David Marriott. Marriott secured plaintiff's commitment to have no contact with John Doe 2 and assigned John Doe 2 a new adviser. Despite this informal resolution, John Doe 2 came forward with an official complaint after reading the publicity, in 2017, about plaintiff's pattern of abusive behavior.

"The investigator again found by a preponderance of the evidence that plaintiff engaged in the alleged misconduct. While plaintiff's 'overall intent may have been benign,' his advising approach was detrimental to John Doe 2. Further, John Doe 2 reasonably viewed plaintiff's conduct as unwelcome and physically aggressive."

5. On page 8, the paragraph that begins, "On November 9, 2018, the Charges Committee found probable cause as to each complainant," is deleted and replaced with: "On November 9, 2018, the Charges Committee found probable cause as to each complainant: Jane Doe, Anneliese H., John Doe 1, and John Doe 2. With respect to Jane Doe, the Charges Committee acknowledged the investigator did not substantiate a violation of the UCSC sexual harassment policy because Jane Doe was not a member of the University community. The committee nonetheless found probable cause under part II of the University's Faculty Code of Conduct (APM-015),[4] *Professional Responsibilities, Ethical Principles, and*

3

*Unacceptable Faculty Conduct* (hereinafter, Faculty Code of Conduct, Part II), which permits faculty members to be disciplined ' "for conduct which is not justified by the ethical principles, and which significantly impairs the University's central functions as set forth in the Preamble." . . . "Other types of serious misconduct, not specifically enumerated herein, may nonetheless be the basis for disciplinary action [if they also meet the preceding standards] . . . .'5"

As to footnote numbers 4 and 5 in this modified paragraph, both their placement (reproduced here) and their text (not reproduced here) are unchanged.

6. On page 10, the paragraph that begins, "With respect to Jane Doe, the PT Committee found clear and convincing evidence," is deleted and replaced with: "With respect to Jane Doe, the PT Committee found clear and convincing evidence that plaintiff violated the Faculty Code of Conduct, Part II, as there was 'no question' his conduct toward Jane Doe at an academic event was not justified by ethical principles and undermined the University's central function to provide an environment ' "conducive to sharing, extending, and critically examining knowledge and values, and to furthering the search for wisdom." ' "

7. On page 11, the last three paragraphs of part II (of the factual and procedural background), including footnote number 8, are deleted and replaced with:

"With respect to John Doe 1, the PT Committee found evidence that plaintiff violated the University's policy on substance abuse by knowingly providing him alcohol and cocaine. However, it concluded the evidence presented at the hearing did not meet the clear and convincing standard since John Doe 1 was vague as to key information, including times, persons, and dates. Accordingly, this charge was dismissed.

"Lastly, the PT Committee dismissed the charge relating to John Doe 2 based on the three-year limitations period set forth in the Faculty Code of Conduct.[1]

---

[1] Department chair David Marriott testified that he knew of the alleged incident as of November 1 or 2, 2015, the day of or after it occurred. Yet, John Doe 2 did not file a formal complaint until 2018, and plaintiff did not receive notice of the University's intent to discipline him until November 14, 2018, about two weeks past the limitations period.

4

"Thus, having unanimously found plaintiff committed serious violations of the Faculty Code of Conduct in the cases of Jane Doe and Anneliese H., the PT Committee recommended his dismissal and denial of emeritus status."

8. On page 18, line 4, "Ms. [Doe]" is deleted and replaced with "[Jane Doe]."

9. On page 18, line 18, the citation "(*Ibid.*)" is deleted.

10. On page 21, the paragraph that begins, "Plaintiff's attempt to paint this explanation as mere postulating," is deleted and replaced with: "Plaintiff's attempt to paint this explanation as mere postulating underscores his ongoing failure to recognize the gravity of his conduct. He sexually abused a fellow academic, Jane Doe, at an academic conference, and when she escorted him from the room, he returned later and abused her again. In response, Jane Doe and Witness 1 were forced to barricade the door for their safety. Plaintiff's colleagues on the PT Committee appropriately determined that his conduct presented a serious risk to the safety of others in the community and that his continued association with UCSC would likely discourage students and professors alike from participating in academic events where he might be present. The 2017 open letter calling on the University to discipline plaintiff for his pattern of abusive behavior, signed by over 150 people, confirms the PT Committee's determination was well founded, as does Witness 1's testimony about the trauma Jane Doe suffered from his abuse. Accordingly, the University's Jane Doe findings stand."

There is no change in the judgment.


Dated: _____    _____, P. J.

5

A164480/Balakrishnan v. Regents of University of California

Trial Court:   Superior Court of the County of Alameda

Trial Judge:   Paul Herbert

Counsel:    Hathaway Parker, Mark M. Hathaway and Jenna E.
       Parker, for Plaintiff and Appellant.

       University of California Office of the General Counsel and
       Katharine Essick; Munger, Tolles & Olson, Hailyn J.
       Chen and Rebecca L. Sciarrino, for Defendant and
       Respondent.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| GOPAL BALAKRISHNAN, | |
| Plaintiff and Appellant, | A164480 |
| v. | |
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, | (Alameda County Super. Ct. No. RG19018682) |
| Defendant and Respondent. | |

This appeal addresses the authority of a public university to discipline a faculty member for certain off-campus behavior. We conclude the University of California, Santa Cruz (University or UCSC), could permissibly find, based on the plain language of its internal policies, rules and regulations, that a tenured professor could be dismissed and denied emeritus status for sexually abusing (1) a fellow academic at an event held in connection with an off-campus academic conference and (2) a UCSC student whom he volunteered to walk home from an off-campus graduation party, two days after she walked in her graduation ceremony.

Plaintiff, Dr. Gopal Balakrishnan, a former tenured UCSC professor, appeals from a judgment denying his petition for a writ of administrative mandate under Code of Civil Procedure section 1094.5[2] to set aside the

---

[2] Unless otherwise stated, all statutory citations herein are to the Code of Civil Procedure.

findings and decision of defendant, The Regents of the University of California (Regents), to terminate his employment and deny him emeritus status.  In so doing, plaintiff does not dispute the University's evidentiary finding that he sexually abused two women.  Rather, he contends: (1) the University lacked jurisdiction to discipline him because the victims did not qualify as University students, (2) the University misinterpreted and misapplied its own regulations and policies, (3) he did not receive notice of all charges, and (4) the sanctions were excessive.

We reject these contentions and affirm the trial court's judgment to deny his writ petition.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff attended Cornell University.  He earned a Ph.D. from the University of California, Los Angeles, and, in 2000, published a well-received scholarly book entitled The Enemy: An Intellectual Portrait of Carl Schmitt.  In 2006, after holding several teaching positions at higher learning institutions in the United States and abroad, plaintiff became an associate professor in UCSC's History of Consciousness Department.  In 2015, he was promoted to tenured professor.

In 2017, an anonymous letter was published online, accusing plaintiff of engaging in a pattern of sexual intimidation, harassment, and assault against young women and gender nonconforming people during his time as a UCSC professor.  The letter contained seven anonymous firsthand accounts of plaintiff's alleged abuse and called on the University to act.  Over 150 people signed this letter to show their support.

Plaintiff publicly denied the accusations in the anonymous letter and blamed " 'the current context of national indignation around the issue of sexual harassment . . . .' "  In response, the University issued a statement

2

that it was aware of the letter and asked individuals with relevant information to contact the Title IX office to assist its investigation.[3]

The University received multiple complaints about plaintiff's conduct. One of the more serious complaints, involving Jane Doe, an academic, came in anonymously. Since Doe did not wish to participate in a formal investigation, the Title IX office relied on information she gave to a news Web site to identify an eyewitness who was willing to speak. The Title IX office also decided to investigate complaints from three other individuals: Brian G., Anneliese H. and Patrick M.

On February 7, 2018, Executive Vice-Chancellor (EVC) Marlene Tromp notified plaintiff that a single investigation of all four complaints would go forward under the Title IX office's supervision. The Title IX office thereafter engaged an outside investigator to conduct the investigation and draft an investigative report, a process that took over six months.[4]

## I.   *The Allegations and Investigative Findings.*

### A.   Jane Doe.

Jane Doe, a poet and academic from the East Coast, met plaintiff when she traveled to Berkeley in 2013 to attend the three-day East Bay Poetry Summit (Poetry Summit), which plaintiff also attended. Doe, along with a friend and professor (Witness 1), were invited to stay overnight at the home

---

[3] Reports of sexual violence and sexual harassment at the University are handled by the Title IX office. When an investigation is warranted, the Title IX office appoints an investigator to conduct the investigation by interviewing witnesses and gathering evidence and then preparing a written report with findings of fact and a recommendation as to whether any University policy was violated.

[4] On February 1, 2018, EVC Tromp placed plaintiff on involuntary leave due to the egregiousness of the allegations against him and for his own protection.

3

of the professor who was hosting the Poetry Summit. One evening, after the Poetry Summit ended for the day, the professor held a party for attendees at her home. It was a festive affair. At some point, Doe and plaintiff were observed kissing. After midnight, however, Doe and Witness 1 retired for the evening to the study where they were sharing a bed. A short while later, Doe woke up to find plaintiff in the study, drunkenly trying to get in bed and asking to have sex with her. She told plaintiff that she was not interested in sexual activity and " 'shooed' " him from the room. Nonetheless, around 2:00 a.m., Doe woke up again to find plaintiff naked and "loom[ing] over her while she lay in bed." Plaintiff climbed into bed, and Doe could feel his penis poking into her side. Doe and Witness 1 forced plaintiff from the room and, this time, barricaded the door with furniture so he could not return.

After completing the Doe investigation, the investigator found plaintiff engaged in "unwelcome physical conduct of a sexual nature which is conduct that falls squarely within the definition of prohibited conduct under the University of California Policy on Sexual Harassment dated February 10, 2006, the policy in effect at the time of the incident." However, the investigator could not substantiate a violation of this policy because it only applied to " 'member[s] of the University community.' "

### B.    Anneliese H.

Anneliese H. walked in her UCSC class graduation on June 16, 2013. Days later, on June 18, 2013, Anneliese attended a graduation party at the off-campus apartment of her friend and neighbor, who was a UCSC student (Friend 1). There, she met plaintiff for the first time without realizing he was a professor. Friend 1 had audited one of plaintiff's classes and invited him to the party in an effort to obtain his mentorship. As the evening progressed, plaintiff danced and flirted with both Anneliese and Friend 1. Anneliese,

4

who was quite intoxicated, began to feel nauseous and " 'on the verge of blacking out or browning out.' " Plaintiff offered to walk her home. Anneliese agreed and, after arriving at her home, she invited him inside. Plaintiff initiated sexual activity, but Anneliese insisted she only wanted to talk to him. Although Anneliese acknowledged experiencing memory lapses after arriving home, she recalled being undressed in bed and kissing plaintiff. Then, after another memory lapse, she " 'came to,' " to find plaintiff on top of her, performing oral sex. Anneliese repeatedly told plaintiff, " 'You need to leave,' " and, " 'I do not want to have sex with you,' " yet he persisted. Plaintiff told Anneliese that he wanted to have anal sex with her. Anneliese was scared, as plaintiff was bigger and stronger than her. Finally, after Anneliese pushed him away several times, plaintiff got up and left.

The next day, Anneliese woke up devastated by what happened with plaintiff. Anneliese's friend (Friend 2), also a UCSC student, went to Anneliese's home, and they discussed the incident. When Friend 2 told Anneliese that plaintiff may have been a professor, she was " 'traumatized.' "

About a week later, Anneliese told Friend 1 what happened with plaintiff. Friend 1 then shared that on the night of her party plaintiff bought her several drinks despite knowing that she was underage. Later, however, Friend 1 told plaintiff that she was not interested in him, after being " 'shocked' " to learn he was 48 years old. At that point, plaintiff appeared to redirect his focus to Anneliese.

Shortly thereafter, Anneliese obtained plaintiff's phone number from Friend 1 and called " 'to confront him.' " Friend 2 was with Anneliese when she made the call and overheard the conversation on speakerphone. When plaintiff answered, Anneliese identified herself. At first, plaintiff flirted with her and asked whether she wanted to meet. Anneliese responded, " That is

5

not why I am calling. I need to let you know what happened the other night was not OK. I was nearly blacked out. You did not have my consent. That is considered rape and it is not OK.'" At that point, plaintiff became defensive, telling Anneliese that it was not a good time to talk and that he had no idea she had been so intoxicated. Plaintiff also accused Anneliese of "'forc[ing] herself on him or seduc[ing] him.'" Anneliese responded, "'That is not OK. You knew how drunk I was.'" The call ended after five to 10 minutes; however, plaintiff later called Anneliese back and left a message. She deleted the message without listening to it.

In 2018, Anneliese contacted the Title IX office after receiving a call from Friend 1, who told her about the accusations that had been publicly raised against plaintiff. Anneliese was enraged that plaintiff was denying the accusations and blaming the "'political'" environment.

The Title IX investigator interviewed Anneliese, her mother, Friend 1, Friend 2, and plaintiff regarding Anneliese's allegations. Plaintiff recalled attending Friend 1's party in June 2013 and meeting Anneliese for the first time. Plaintiff claimed that he left the party alone and was walking to his car when Anneliese came out of her apartment. According to plaintiff, Anneliese pulled him toward her apartment and he "reluctantly went in." After talking briefly, Anneliese suggested sexual activity, which surprised him. However, because Anneliese was highly intoxicated, plaintiff "extricated [him]self from the interaction and left her apartment and went home." He denied being naked or attempting to have sex with her. According to plaintiff, when Anneliese called him about a month later, she "clearly indicated" having no memory of what transpired between them that evening.

After concluding the Anneliese investigation, the investigator found "it is more likely than not that [plaintiff] engaged in unwelcome physical conduct of a sexual nature which is conduct that falls squarely within the definition of prohibited conduct under the University of California Policy on Sexual Harassment Policy [*sic*] dated February 10, 2006, the policy in effect at the time of the incident . . . ." This "unwelcome sexual activity occurred on June 18, 2013 after [Anneliese] had completed her course work and participated in commencement but before her degree was conferred."

## C.     Brian G. and Patrick M.

Former UCSC student Brian G. reported that, during the fall or winter of 2009, when he was 18 years old, he attended a small party at plaintiff's residence. Brian knew plaintiff through campus activities but was not his student. At this party, plaintiff gave Brian and other attendees cocaine and alcohol, and afterward he drove Brian home while under the influence of alcohol and drugs. Brian also recalled other occasions during this time period when plaintiff bought him alcohol at local bars although he was underage. Brian contacted the Title IX office after learning of the public accusations that had been raised against plaintiff because he believed his experiences were relevant.

Following an investigation, the investigator found by a preponderance of evidence that plaintiff gave Brian G. alcohol and cocaine at a party and bought him alcohol at least twice at local bars despite knowing he was under age 21.

Patrick M. was a Ph.D. candidate in the History of Human Consciousness Department in 2015, and plaintiff was his adviser. According to Patrick, one afternoon he visited plaintiff's office to discuss his dissertation. The pair engaged in a heated discussion regarding the

appropriate direction of Patrick's dissertation. At some point, plaintiff became verbally and physically aggressive. Patrick protested and tried to leave, but plaintiff blocked him by lunging at him and aggressively grabbing him.

Patrick reported this incident to Professor Dean Mathiowetz in November 2015 and later discussed it with the department's chair, David Marriott. Marriott secured plaintiff's commitment to have no contact with Patrick and assigned Patrick a new adviser. Despite this informal resolution, Patrick came forward with an official complaint after reading the publicity, in 2017, about plaintiff's pattern of abusive behavior.

The investigator again found by a preponderance of the evidence that plaintiff engaged in the alleged misconduct. While plaintiff's "overall intent may have been benign," his advising approach was detrimental to Patrick. Further, Patrick reasonably viewed plaintiff's conduct as unwelcome and physically aggressive.

## II.  *The Four Charges and Administrative Hearing.*

The investigation reports were forwarded to the University's Charges Committee to assess whether there was sufficient evidence to initiate disciplinary action.

On November 9, 2018, the Charges Committee found probable cause as to each complainant: Jane Doe, Anneliese H., Brian G., and Patrick M. With respect to Doe, the Charges Committee acknowledged the investigator did not substantiate a violation of the UCSC sexual harassment policy because Doe was not a member of the University community. The committee nonetheless found probable cause under part II of the University's Faculty Code of Conduct (APM-015),[5] *Professional Responsibilities, Ethical Principles, and*

---

[5] See footnote 5, *post*, page 9.

*Unacceptable Faculty Conduct* (hereinafter, Faculty Code of Conduct, Part II), which permits faculty members to be disciplined " 'for conduct which is not justified by the ethical principles, and which significantly impairs the University's central functions as set forth in the Preamble.' . . . 'Other types of serious misconduct, not specifically enumerated herein, may nonetheless be the basis for disciplinary action [if they also meet the preceding standards] . . . ."[6]

Accordingly, on November 14, 2018, EVC Tromp issued plaintiff a notice of intent to discipline. In the notice, EVC Tromp proposed that plaintiff be dismissed and denied emeritus status "based on the egregious nature of [his] misconduct . . . ." She also advised plaintiff of his right to a formal hearing under academic senate bylaw 336 before the Committee on Privileges and Tenure (PT Committee) prior to the imposition of any disciplinary sanction.

This formal administrative hearing took place over five days in May 2019. Initially, the PT Committee, made up of three UCSC professors, heard and denied 12 prehearing motions brought by plaintiff's counsel. The committee then heard from 11 University witnesses,[7] including Witness 1 in the Jane Doe case and Anneliese H., before issuing its final report on July 18, 2019.

With respect to Jane Doe, the PT Committee found clear and convincing evidence that plaintiff violated the Faculty Code of Conduct, Part II, as there was "no question" his conduct toward Doe at an academic

---

[6] "APM" refers to the University's Academic Personnel Manual. The Faculty Code of Conduct is found at APM-015.

[7] Plaintiff and his counsel declined to participate in the hearing before the PT Committee.

event was not justified by ethical principles and undermined the University's central function to provide an environment " 'conducive to sharing, extending, and critically examining knowledge and values, and to furthering the search for wisdom.' "

As to Anneliese H., the PT Committee found by clear and convincing evidence that plaintiff's conduct violated "APM 015 II.C.7: Serious violation of University policies governing the professional conduct of faculty (specifically, the University Policy on Sexual Harassment, 2006)."[8] It also found "a close nexus" between plaintiff in his role as University representative and his conduct, since he was invited to the graduation party where he met Anneliese by a student who sought to foster his mentorship. Then, after using his professor status to connect with these women, plaintiff treated Anneliese in an "unwelcome, deeply harm[ful]" manner—conduct that constituted a " 'serious violation of University policies governing the professional conduct of faculty' within the meaning of the [Faculty Code of Conduct], APM 015 II.C.7."

The PT Committee also found plaintiff's conduct independently violated other Faculty Code of Conduct provisions. As in the case of Jane Doe, his sexual abuse of Anneliese was not justified by ethical principles and

---

[8] The sexual harassment policy defines "[s]exual harassment" as "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature, when submission to or rejection of this conduct explicitly or implicitly affects a person's . . . education, unreasonably interferes with a person's work or educational performance, or creates an intimidating, hostile or offensive working or learning environment. . . . [¶] . . . [¶] In determining whether the reported conduct constitutes sexual harassment, consideration shall be given to the record of the conduct as a whole and to the totality of the circumstances, including the context in which the conduct occurred."

significantly impaired the University's central functions and, as such, violated the Faculty Code of Conduct, Part II.

With respect to Brian G., the PT Committee found evidence that plaintiff violated the University's policy on substance abuse by knowingly providing him alcohol and cocaine. However, it concluded the evidence presented at the hearing did not meet the clear and convincing standard since Brian was vague as to key information, including times, persons, and dates. Accordingly, this charge was dismissed.

Lastly, the PT Committee dismissed the charge relating to Patrick M. based on the three-year limitations period set forth in the Faculty Code of Conduct.[9]

Thus, having unanimously found plaintiff committed serious violations of the Faculty Code of Conduct in the cases of Doe and Anneliese H., the PT Committee recommended his dismissal and denial of emeritus status.

## III. *Plaintiff's Dismissal and Denial of Emeritus Status.*

On August 15, 2019, UCSC Chancellor Cynthia K. Larive notified plaintiff that she had adopted the unanimous findings and recommendations of dismissal and denial of emeritus status set forth in the PT Committee's July 2019 report. Chancellor Larive also imposed the interim sanction of "suspension without pay effective with the date of this letter until the earlier of either: 1) dismissal pursuant to my recommendation; or 2) twenty (20) years." In doing so, Chancellor Larive informed plaintiff that, while "not relevant to my recommendations to the President and Regents, or the

---

[9] Department chair David Marriott testified that he knew of the alleged incident as of November 1 or 2, 2015, the day of or after it occurred. Yet, Patrick did not file a formal complaint until 2018, and plaintiff did not receive notice of the University's intent to discipline him until November 14, 2018, about two weeks past the limitations period.

11

exercise of my authority under [the academic senate bylaws], it is notable that the record before me is devoid of any acknowledgement from you about your behavior or the detrimental impacts of your misconduct on the direct victims or the University."

On August 23, 2019, University of California President Janet Napolitano issued a decision, based on her own independent review of the record, recommending that the Regents dismiss plaintiff from the University's employ.[10]

In September 2019, the Regents held a meeting to consider President Napolitano's recommendation of dismissal. Plaintiff did not avail himself of the opportunity to appear personally or through counsel. He did, however, submit a written statement arguing that the University lacked jurisdiction to pursue either incident of sexual misconduct because they occurred off campus and involved nonstudents. At the meeting's conclusion, the Regents unanimously voted in favor of plaintiff's dismissal and denial of emeritus status.

**IV.** *Petition for Writ of Administrative Mandate.*

On October 2, 2020, plaintiff filed the operative third amended petition for writ of administrative mandate in Alameda Superior Court. A hearing was held on September 1, 2021. Afterward, the court denied the petition, declining to set aside the administrative findings or sanction. This timely appeal followed.

**DISCUSSION**

Plaintiff contends on appeal: (1) the University lacked jurisdiction to discipline him with respect to Jane Doe or Anneliese H. because they were

---

[10] President Napolitano deferred decision on denial of emeritus status pending the Regents' decision on her dismissal recommendation.

not University students; (2) in the case of Jane Doe, he cannot be disciplined for violating general ethical principles and there was no evidence his conduct significantly impaired the University's central functions; (3) in the case of Anneliese H., he cannot be disciplined for violating uncharged provisions of the Faculty Code of Conduct for which he did not receive notice; and (4) the sanctions of dismissal and denial of emeritus status were excessive. We address these contentions *post*, in appropriate order.[11]

## I.    *Administrative Mandate: Standard of Review.*

"To prevail, a petitioner seeking a writ of administrative mandate must show the agency (in this case, [the University]) (1) acted without, or in excess of, its jurisdiction; (2) deprived the petitioner of a fair administrative hearing; or (3) committed a prejudicial abuse of discretion. (§ 1094.5, subd. (b); *Doe v. University of Southern California* (2016) 246 Cal.App.4th 221, 239 [200 Cal.Rptr.3d 851] (*Southern California I*) [§ 1094.5's 'fair trial' requirement means there must be a fair administrative hearing].) [Fn. omitted.] ' "Abuse of discretion is established if the [agency] has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." ' [Citations.]" (*Doe v. Regents of University of California* (2021) 70 Cal.App.5th 521, 532.)

---

[11] Plaintiff raises two additional contentions that we decline to consider: (1) the University's consolidation of two unrelated complaints was prejudicial and (2) the denial of his request for a continuance of the administrative hearing was unfair. We deem these contentions forfeited due to plaintiff's failure, in his opening brief, to support them with reasoned legal argument. (See *People v. Guzman* (2019) 8 Cal.5th 673, 683, fn. 7 [appellant forfeited due process claim by failing to "develop the argument"]; *In re Phoenix H.* (2009) 47 Cal.4th 835, 845 [" ' "Contentions supported neither by argument nor by citation of authority are deemed to be without foundation and to have been abandoned" ' "].)

Where, as here, an administrative decision involves a fundamental vested right to employment, the trial court "independently review[s] the record to determine whether the weight of evidence supports a factual finding, whereas the substantial evidence test applies when a fundamental right is not at issue. (*Wences v. City of Los Angeles* (2009) 177 Cal.App.4th 305, 313 [99 Cal.Rptr.3d 199] (*Wences*).) But [as] the appellate court[, we] appl[y] a substantial evidence test, regardless of whether a fundamental right is involved. (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 824 [85 Cal.Rptr.2d 696, 977 P.2d 693].)" (*O'Brien v. Regents of University of California* (2023) 92 Cal.App.5th 1099, 1116.) Further, as always, we exercise independent judgment on legal issues. (*Manderson-Saleh v. Regents of University of California* (2021) 60 Cal.App.5th 674, 693 (*Manderson-Saleh*).)

## II. *The University's Findings as to Jane Doe Stand.*

### A. **Plaintiff's Jurisdiction Argument Fails.**

Plaintiff contends the Jane Doe findings must be set aside because the University cannot "exercise limitless jurisdiction by policing and prosecuting faculty for conduct that occurs off campus after hours, separate and apart from the faculty member's professional role at UCSC." The following rules apply.

"The University is a statewide administrative agency with constitutionally derived powers. (Cal. Const., art. IX, § 9, subd. (a); [citation].) Its employees are public employees. [Citation.] The University is administered by the Regents. (Cal. Const., art. IX, § 9, subd. (a).) Regents have rulemaking and policymaking power in regard to the University; their policies and procedures have the force and effect of statute." (*Kim v. Regents of University of California* (2000) 80 Cal.App.4th 160, 165.) Generally, the

14

rules that govern statutory interpretation also govern interpretation of administrative regulations. (*Akella v. Regents of University of California* (2021) 61 Cal.App.5th 801, 817 (*Akella*).) "Further, policies established by the Regents according to their constitutionally derived rulemaking and policymaking power, like the Academic Personnel Manual, have the force and effect of statute." (*Ibid.*)

"Generally, the interpretation of a regulation [or statute] ' "is . . . a question of law" and is . . . subject to de novo review.' [Citation.] However, a reviewing court accords an administrative agency's interpretation of its own regulation great weight and deference, unless the interpretation is unauthorized or clearly erroneous. [Citations.] This rule recognizes that an 'agency has developed a level of "expertise" in light of its familiarity with the legal and regulatory issues.' [Citation.] Courts are particularly deferential of the Regents' determinations because of its role as a state constitutional entity. [Citations.] Thus, although we are not bound by the Regents' interpretation, we give it great weight under the circumstances. (See *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 12 [citations]; [citation].)" (*Manderson-Saleh, supra*, 60 Cal.App.5th at p. 697; accord, *Akella, supra*, 61 Cal.App.5th at p. 817 ["considering it is well within the Regents' constitutionally delegated authority [citation] to hear and resolve disputes related to the administration of the university's academic affairs 'by applying University policies to particular cases' [citation], we conclude that Privilege & Tenure's interpretation is entitled to a reasonable degree of judicial deference"].)[12]

---

[12] The *Akella* court recognized the degree of deference owed the University in interpreting one of its policies depends on the interpreter's familiarity with the policy at issue, whether the University has adhered consistently to the interpretation at issue, and whether there was an

In determining that plaintiff's conduct toward Jane Doe was subject to discipline, the University relied on Faculty Code of Conduct, Part II. The relevant provision states: "Th[e] listing of faculty responsibilities, ethical principles, and types of unacceptable behavior is organized around the individual faculty member's relation to teaching and students, to scholarship, to the University, to colleagues, and to the community. Since University discipline, as distinguished from other forms of reproval or administrative actions, should be reserved for faculty misconduct that is either serious in itself or is made serious through its repetition, or its consequences, the following general principle is intended to govern all instances of its application: [¶] University discipline under this Code may be imposed on a faculty member only for conduct which is not justified by the ethical principles and which significantly impairs the University's central functions as set forth in the Preamble. . . . The Types of Unacceptable Conduct listed below in Sections A through E are examples of types of conduct which meet the preceding standards and hence are presumptively subject to University discipline. Other types of serious misconduct, not specifically enumerated herein, may nonetheless be the basis for disciplinary action if they also meet the preceding standards." (Italics omitted.)

According to plaintiff, this language permits faculty members to be disciplined only as to matters "in the scope of their professional roles, not after they have hung up their coat and kicked off their shoes at the end of the day, and certainly not after an after-party for an off-campus poetry summit [unaffiliated] with UCSC."

---

opportunity for comment to be made on the interpretation. (*Akella, supra*, 61 Cal.App.5th at pp. 816–817.)

In its final report, however, the PT Committee interpreted this provision otherwise: "The [Faculty Code of Conduct] does in fact extend to interactions between faculty and 'the community': 'This listing of faculty responsibilities, ethical principles, and types of unacceptable behavior is organized around the individual faculty member's relation to teaching and students, to scholarship, to the University, to colleagues, and to the community'. (APM 015, Part II.) The 'community' meant here is clearly not the University community, but the community at large. It is not true that the conduct in question had no relation to the University. The poetry summit was an academic conference (testimony by [Witness 1], HT p. 272), and [plaintiff's] presence at it was clearly related to his status as a Professor at the University. The question before us, then, is whether [plaintiff's] conduct in the [Jane Doe] incident was conduct which 'is not justified by the Ethical Principles and which significantly impairs the University's central functions as set forth in the Preamble'.

"There is no question that the behavior was not justified by the Ethical Principles. We also find that it significantly impairs the University's central functions. The Preamble states: 'The University seeks to provide and sustain an environment conducive to sharing, extending, and critically examining knowledge and values, and to furthering the search for wisdom.' The University is impaired in this function if its faculty, without consequence or sanction, engage in behavior in the context of professional events that would not be tolerated on campus because of their clear incompatibility with sustaining an environment 'conducive to sharing, extending, and critically examining knowledge and values, and to furthering the search for wisdom'. For example, it is to be expected that neither Ms. [Doe] nor [Witness 1] (nor potentially others who became aware of the behavior) would want to work

17

with [plaintiff] (or even with anyone from UCSC) in the future, if they see that this behavior has no consequences. In other words: only a safe environment is an environment conducive to sharing knowledge and values."

Applying the above stated rules of statutory interpretation, we conclude the PT Committee's reading of the Faculty Code of Conduct was consistent with the plain and commonsense meaning of the Code's language. (*Akella, supra*, 61 Cal.App.5th at pp. 817–818.) The PT Committee's interpretation also gave meaning to the provision "as a whole, giving effect to all of its parts . . . ." (*Id.* at p. 818.) And lastly, the PT Committee's interpretation respected the University's underlying intent in prohibiting faculty conduct "not justified by the Ethical Principles and which significantly impairs the University's central functions." (*Ibid.*) As explained in the PT Committee's final report, "only a safe environment is an environment conducive to sharing knowledge and values." Climbing naked and uninvited into bed with and pressing his genitalia against a female academic attending the same academic conference at a party given by the conference host (also a professor) clearly created an unsafe environment not conducive to the sharing of knowledge and values.[13]

We hasten to add this interpretation of the Faculty Code of Conduct was made by a committee comprised of three of plaintiff's fellow UCSC professors, adding to its evidentiary weight. As recognized by numerous courts, "contextual familiarity matters. The disputed policy language, while

---

[13] We reject plaintiff's suggestion in his reply brief that there was no evidence he attended the poetry summit in his professional capacity. Witness 1 testified at the administrative hearing that the poetry summit was an offsite "academic conference" organized by "poets, professors, and members of the community in the East Bay" and that conference participants knew and respected plaintiff as a historian of consciousness. Plaintiff chose not to participate in the hearing and, thus, presented no contrary evidence.

not complex or technical, should be interpreted in a manner that is both knowledgeable of and sensitive to the needs of [the] department and university population to which it applies. (See *Simi Corp. v. Garamendi* (2003) 109 Cal.App.4th 1496, 1505 [citation] [noting the 'particular expertise' of the agency's commissioner in that case was a 'deep understanding of the *context* in which the regulation exists']; *Berman* [*v. Regents of University of California* (2014)] 229 Cal.App.4th [1265,] 1271–1272 [explaining that the court accords great weight and respect to the administration's construction of the university's student conduct code based on its expertise and familiarity with the legal and regulatory issues].)" (*Akella, supra*, 61 Cal.App.5th at p. 817.) There is no evidence calling into question the PT Committee's familiarity with both the Faculty Code of Conduct as a legal document and the significance that its enforcement has within the University community.

For the foregoing reasons, we uphold the University's finding that plaintiff's conduct toward Jane Doe at a party held in connection with an off-campus academic conference was subject to discipline under the Faculty Code of Conduct.

### B. Petitioner Violated Ethical Principles that Significantly Impaired the University's Central Functions.

Plaintiff next contends the University lacked authority to discipline him for conduct not enumerated as " 'unacceptable conduct' " in the Faculty Code of Conduct. A plain, commonsense reading of the Faculty Code of Conduct, Part II, defeats plaintiff's contention.

The relevant provision, discussed *ante*, states: "The *Types of Unacceptable Conduct* listed below in Sections A through E are examples of types of conduct which meet the preceding standards and hence are presumptively subject to University discipline. *Other types of serious misconduct, not specifically enumerated herein, may nonetheless be the basis*

19

*for disciplinary action.*" (2d italics added.) This language reflects the University's clear intent to authorize discipline for conduct not specifically laid out in the Faculty Code of Conduct, Part II, if it otherwise meets the standard of violating "ethical principles and . . . significantly impair[ing] the University's central functions . . . ." Again, the PT Committee's interpretation of this language is reasonable and entitled to our deference. (*Akella, supra*, 61 Cal.App.5th at pp. 817–818; *Manderson-Saleh, supra*, 60 Cal.App.5th at p. 697 [courts accord an administrative agency's interpretation of its own regulation great weight and deference, unless the interpretation is "unauthorized or clearly erroneous"].)

Plaintiff deflects with a fairness argument, insisting he had no notice the University would seek to regulate faculty behavior at a non-University event with respect to conduct not articulated in the Faculty Code of Conduct. We disagree. The regulated conduct was in fact set forth in the code, providing notice to him and other faculty members as to what was not acceptable—to wit, "conduct which is not justified by the ethical principles and which significantly impairs the University's central functions . . . ." The code's failure to enumerate every type of conduct meeting this standard does not render this provision unenforceable.

Finally, plaintiff claims the University "postulated without support that anytime a faculty member engages in conduct that would not be tolerated on campus, the University's central functions are impaired." Not so.

The PT Committee explained its Jane Doe finding as follows: "The University is impaired in this function if its faculty, without consequence or sanction, engage in behavior in the context of professional events that would not be tolerated on campus because of their clear incompatibility with

20

sustaining an environment 'conducive to sharing, extending, and critically examining knowledge and values, and to furthering the search for wisdom.' For example, it is to be expected that neither [Jane Doe] nor [Witness 1] (nor potentially others who became aware of the behavior) would want to work with Professor Balakrishnan (or even with anyone from UCSC) in the future, if they see that this behavior has no consequences. In other words: only a safe environment is an environment conducive to sharing knowledge and values."

Plaintiff's attempt to paint this explanation as mere postulating underscores his ongoing failure to recognize the gravity of his conduct. He sexually abused a fellow academic, Jane Doe, at an academic conference, and when she escorted him from the room, he returned later and abused her again. In response, Doe and Witness 1 were forced to barricade the door for their safety. Plaintiff's colleagues on the PT Committee appropriately determined that his conduct presented a serious risk to the safety of others in the community and that his continued association with UCSC would likely discourage students and professors alike from participating in academic events where he might be present. The 2017 open letter calling on the University to discipline plaintiff for his pattern of abusive behavior, signed by over 150 people, confirms the PT Committee's determination was well founded, as does Witness 1's testimony about the trauma Doe suffered from his abuse. Accordingly, the University's Jane Doe findings stand.

III. *The University's Findings as to Anneliese H. Stand.*

A. **Petitioner's Jurisdiction Challenge Fails.**

Plaintiff contends the University had no jurisdiction over Anneliese H.'s complaint because she was not a student or member of the University community when he sexually harassed her. Plaintiff relies upon

the definition of "student" in the University's Policies Applying to Campus Activities, Organizations and Students, part III, section 14.00, DEFINITIONS, which states: A " 'student' " is "an individual for whom the University maintains student records and who: (a) is enrolled in or registered with an academic program of the University; (b) has completed the immediately preceding term, is not presently enrolled, and is eligible for re-enrollment; or (c) is on an approved educational leave or other approved leave status, or is on filing-fee status." According to plaintiff, Anneliese was a graduate who did not meet this definition, such that the University's sexual harassment policy did not apply to her. Not so.

The evidence demonstrated that Anneliese walked in the UCSC graduation ceremony on June 16, 2018, about two days before attending the party after which plaintiff sexually harassed her. In fact, she attended this party in part to celebrate her graduation. At that time, the University had not yet audited Anneliese's grades or conferred her degree, which did not occur until July 2018. Under these circumstances, we conclude the evidence supports a finding that Anneliese was in fact a student under the University's policies.

In any event, as the PT Committee pointed out, the University's sexual harassment policy dated February 1, 2006, page 1, states, "Sexual harassment may include incidents between any members of the University community, including faculty and other academic appointees, staff, coaches, housestaff, students, and non-student or non-employee participants in University programs, such as vendors, contractors, visitors and patients." Given this broad standard, "it is not necessary to quibble over the exact moment when [Anneliese H.] ceased being a student. The Sexual Harassment policy prohibits Sexual Harassment of any member of the

22

University community. . . . There may be some question whether alumni remain members of the University community for the rest of their lives, but certainly a graduating senior does not cease to be a member of the University community on the last day of the final quarter. For this reason, we believe that the University Sexual Harassment policy does prohibit the behavior committed by Professor Balakrishnan on this occasion, and thus that this behavior was a violation of the Sexual Harassment policy, and consequently a violation of the FCC (APM 015.II.C.7)."

We conclude the PT Committee's interpretation was consistent with both the language and purpose of the sexual harassment policy. Moreover, as stated before, the PT Committee was comprised of three of plaintiff's professor colleagues who were individually and collectively "knowledgeable of and sensitive to the needs of [the] . . . university population to which [the policy] applies." (*Akella, supra*, 61 Cal.App.5th at p. 817, citing *Simi Corp. v. Garamendi, supra*, 109 Cal.App.4th at p. 1505, and *Berman v. Regents of University of California, supra,* 229 Cal.App.4th at pp. 1271–1272.) Relevant here, as the PT Committee found, Friend 1 invited plaintiff to her graduation weekend party after having audited one of his classes because she was seeking his mentorship. Anneliese knew Friend 1 because they were both UCSC students living with other students in off-campus housing. Anneliese met plaintiff at Friend 1's party and was sexually abused by him after he volunteered to walk her home, when she fell ill due to having consumed too much alcohol. In these circumstances, plaintiff's claim that Anneliese had ceased to be a member of the University community entitled to protection under the sexual harassment policy two days before he abused her rings hollow.

23

## B. Plaintiff Had Notice of the Charge.

Plaintiff contends he had no notice of one of the two charges against him in the case of Anneliese H. The first charge, discussed *ante*, was for violation of the University's sexual harassment policy. The second charge, of which plaintiff claims he had no notice, was for a violation of the Faculty Code of Conduct, Part II. We reject this contention.

Plaintiff is correct the notice of intent to discipline issued by the University identified one charge relating to Anneliese H.: "Alleged violation: APM 015 II.C.7: Serious violation of University policies governing the professional conduct of faculty (specifically, the University Policy on Sexual Harassment, 2006)." Following the hearing, the PT Committee found a violation of the sexual harassment policy and, thus, APM 015 II.C.7, with respect to plaintiff's conduct toward Anneliese. In addition, the committee found his conduct "independently violated the [Faculty Code of Conduct]," which "prohibits, in general, faculty conduct that is unacceptable because it is 'not justified by the Ethical Principles and significantly impairs the University's central functions as set forth in the Preamble' (APM 015, Preamble)." The committee reasoned: "Students have a right to expect that the University does not tolerate faculty who attempt to rape people. The University has an obligation to honor that right."

The PT Committee's findings and recommendations were then reviewed by Chancellor Larive, who determined, based on her own review of the evidence, that plaintiff violated the University's sexual harassment policy (and, thus, APM 015 II.C.7). Chancellor Larive made no mention of, or finding as to, the Faculty Code of Conduct, Part II, before submitting her recommendation of dismissal and denial of emeritus status to University President Napolitano.

24

After her own review, University President Napolitano adopted the same finding of a violation of the University's sexual harassment policy in submitting her recommendation of dismissal to the Regents, which the Regents then approved—the administrative decision challenged by this writ petition.

Plaintiff's lack-of-notice claim thus fails. In the case of Anneliese H., he was charged with—and disciplined for—only the serious violation of the University's sexual harassment policy.

## IV. *The Sanctions Imposed Were Not Excessive.*

Lastly, plaintiff contends dismissal of a tenured professor and denial of emeritus status for conduct that was never criminally charged, resulting in a loss of "upwards of a million dollars" in salary and benefits, is constitutionally excessive (Cal. Const., art. I, § 17). We disagree.

"We review the penalty imposed by an administrative body for an abuse of discretion. [Citation.] This court cannot 'substitute its discretion for that of the administrative agency concerning the degree of punishment imposed.' [Citation.] Moreover, '[i]t is only in the exceptional case, when it is shown that reasonable minds cannot differ on the propriety of the penalty, that an abuse of discretion is shown.' [Citation.]" (*Doe v. Regents of University of California* (2016) 5 Cal.App.5th 1055, 1106; *Hughes v. Bd. of Architectural Examiners* (1998) 68 Cal.App.4th 685, 692 [courts " 'pay great deference to the expertise of the administrative agency in determining the appropriate penalty to be imposed' "].)

The University found clear and convincing evidence that plaintiff egregiously sexually abused both Jane Doe and Anneliese. As to the latter, in particular, plaintiff took advantage of Anneliese's extreme intoxication to enter her home and attempt to rape her. Rather than challenge this

25

evidence, plaintiff attempts to minimize its significance.  However, as the University's chancellor found, given the nature and severity of plaintiff's conduct, the harm to the victims, and the harm to the University, his dismissal and denial of emeritus status were warranted on the basis of either *or* both incidents.  The University's decisions were well within its discretion.

## DISPOSITION

The judgment is affirmed.


Jackson, P. J.

WE CONCUR:

Burns, J.
Chou, J.

A164480/Balakrishnan v. Regents of University of California

Trial Court:          Superior Court of the County of Alameda

Trial Judge:          Paul Herbert

Counsel:              Hathaway Parker, Mark M. Hathaway and Jenna E.
                          Parker, for Plaintiff and Appellant.

                      University of California Office of the General Counsel and
                          Katharine Essick; Munger, Tolles & Olson, Hailyn J.
                          Chen and Rebecca L. Sciarrino, for Defendant and
                          Respondent.